**In The**
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-22-00278-CV**
**IN RE COMMITMENT OF RICHARD RAYMOND POLTORAK**

**On Appeal from the 359th District Court**
**Montgomery County, Texas**
**Trial Cause No. 21-09-12791-CV**

## MEMORANDUM OPINION

A jury unanimously determined beyond a reasonable doubt that Richard Raymond Poltorak is a sexually violent predator under the Sexually Violent Predators Act. *See* Tex. Health & Safety Code Ann. §§ 841.001–.153. In three issues, Poltorak challenges the legal and factual sufficiency of the evidence supporting the jury's finding that he is a sexually violent predator and the trial court's admission of expert testimony on unadjudicated offenses. We affirm the trial court's judgment.

1

BACKGROUND

The State filed a petition seeking Poltorak's civil commitment as a sexually violent predator. A jury trial was held to determine whether Poltorak should be civilly committed as an SVP. In addition to the presentation of documentary evidence, the State called two witnesses during trial, psychologist Dr. Jennifer Rockett and Poltorak. The defendant did not call any witnesses at the trial.

Pretrial Hearing

The trial court conducted a pretrial hearing to allow the parties to voir dire Dr. Rockett. Dr. Rockett explained that for purposes of her evaluation, she reviewed records, including offense reports, prison records, and court judgments, which were records typically reviewed by experts in her field for these evaluations, and she met with Poltorak. Rockett testified Poltorak had convictions from two courts for indecency with a child by contact pertaining to Kensie and Carrie.[1] She discussed both offenses and described the conduct that led to the convictions. Rockett explained that she considered the offense report noting Kensie alleged Poltorak had engaged in the conduct several times, even though Poltorak was not convicted for those allegations. Rockett testified the records showed that Carrie alleged Poltorak

---

[1] We use pseudonyms to refer to the victims, minor children. *See* Tex. Const. art. 1, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal judicial process").

touched her vagina at least four times and threw her against a wall, which Rockett took as an allegation of violence.

Rockett testified that she considered other allegations including prison misconduct and that Poltorak inappropriately touched another girl, Gina, based on a police report. Rockett explained that these other allegations contributed to her understanding of Poltorak's grooming behaviors and possible victim patterns, and thus to an overall understanding of his offending behavior.

Rockett considered the victims' outcries where reports indicated it happened more than once, because "it establishes a pattern of behavior . . . when we think about behavioral abnormality, we think about antisocial personality disorder, we may think about sexual deviance. We're looking for those patterns and behaviors." Rockett explained it was standard practice in her field to review documents like police reports, prison records, and victim outcry statements when conducting behavioral abnormality evaluations and sex offender risk assessments. The trial court ruled that the unadjudicated offenses were admissible because Rockett relied on them to form the basis of her opinion. The trial court cited to *In re Commitment of Day*, 342 S.W.3d 193 (Tex. App.—Beaumont 2011, pet. denied), and Rule 403 in reaching her decision.

TRIAL EVIDENCE

Dr. Rockett's Testimony

Rockett conducted a behavioral abnormality evaluation on Poltorak. Rockett has a doctorate in clinical psychology with a forensic emphasis and is licensed in several states, including Texas. Rockett described the procedure she follows in conducting a behavioral abnormality evaluation, which included: obtaining and reviewing the records; conducting a clinical forensic interview; scoring the Static-99R and PCL-R; and sometimes conducting collateral interviews. She testified the method she followed in Poltorak's case was "standard practice" and in accordance with her training as a forensic psychologist. The records she reviewed included pen packets, jail records, prison records, mental health records, court records, treatment records, medical records, and any other records she could obtain. These are records typically reviewed in her field, and she relied on the facts and data in them in forming the basis of her opinion.

She testified that she relied on records along with the interview since people are not always truthful, so it is "important as a forensic psychologist that you're not just relying on one data point." Rockett explained the importance of historical information in determining whether Poltorak currently has a behavioral abnormality, since past offenses inform as to patterns like grooming behaviors and how mental illness may impact offending patterns. Rockett testified that "past behavior is

4

methodically known as the best predictor of future behavior." Rockett explained that in the context of the applicable statute, they look for something that will make it more likely or predispose the offender to commit sexual violence again. To determine this, Rockett looks at various factors a person has which are shown in research and literature to be associated with a risk of reoffending.

Rockett testified that another psychologist, Dr. Darrel Turner, first evaluated Poltorak and prepared a report that she reviewed. She explained it was important to see what a person has told another evaluator when you consider what they are telling you. Poltorak renewed his pretrial objection, added a hearsay objection, and requested a limiting instruction; the trial court overruled the objection and read a limiting instruction to the jury informing them that Rockett relied on the information to form the basis of her opinion, but explained that it could not be considered as evidence to show the truth of the matter asserted. Rockett testified that Turner opined Poltorak has a behavioral abnormality.

Rockett met with Poltorak over two days in November 2021. She scored actuarial testing instruments including the Static-99R and the Hare Psychopathy Checklist-Revised (PCL-R). Rockett explained how and why she used the actuarial measures in her evaluation and how they helped her predict risk. In evaluating those things, she looked at the facts and data related to the sexual offenses. She said she used tools given to the people in her field, scored the actuarial testing instruments,

and considered the interviews and other things to form her opinion. Rockett testified that Poltorak has two convictions for sexual offenses, and it was appropriate to consider allegations of sexual offenses that had not led to convictions, because it shows patterns of victims and grooming behavior, plus it was important to assess the person's behavior over time.

Rockett testified the first sexual offense Poltorak committed as an adult was when he was nineteen against a five-year-old girl, Kensie. Prior to discussing the detailed allegations, Poltorak again objected based on hearsay and renewed his pretrial objection to this testimony, which the trial court overruled noting it was information Rockett reviewed that formed the basis of her opinion. The trial court again admonished the jury with the limiting instruction. Poltorak told Rockett that he and Kensie were neighbors; he helped her mother with bills and babysat Kensie. Rockett testified that Poltorak put a dollar bill in his pocket for the vending machine and had Kensie reach into his pocket for the dollar to touch his "private part," which is the offense for which he was convicted. Rockett reviewed Poltorak's voluntary statement given to police, and she noted that Poltorak admitted to the offense since he signed a plea bargain. However, Poltorak told Rockett it was not intentional or sexual, and she noted it was significant that he alternately admitted and denied the crimes by providing contradictory statements, then "mix[ed] the two together in a very manipulative way." The records showed that Kensie said this happened three

or four times, which "speaks to [a] possible pattern of grooming, possible pattern of behaviors that went undetected." Rockett testified this offense against Kensie was sexually deviant because it involved a prepubescent child. Poltorak pled guilty and was put on deferred adjudication probation for ten years but violated conditions of his probation by obtaining employment that involved children and by having unsupervised contact with minors. Rockett considered these probation violations since they constituted a risk factor for general and sexual violence. Rockett testified Poltorak's deferred adjudication probation was revoked, and he was incarcerated on the indecency with a child by contact offense against Kensie. In 1994, he received an eight-year sentence and was sent to prison.

Rockett testified that in 1996, Poltorak was released on parole, which also required him to comply with certain conditions, including staying away from children, but Poltorak violated his parole conditions again by having contact with children and Poltorak was returned to prison to serve his sentence. Rockett explained this violation of conditional release was problematic because he "did similar type behaviors and patterns that led him to be arrested in the first place," while out of prison.

Rockett discussed the complaint made in 1999 for his second indecency with a child by sexual contact offense, which involved five-year-old Carrie. Rockett spoke with Poltorak about Carrie, and like the previous victim, he was friends with

7

Carrie's mother and helped her "by paying bills, babysitting for her occasionally, and being involved in the home[,]" which were further indicators of his grooming patterns. Rockett said the records revealed he fondled Carrie's vagina several times and once forcibly pushed her into a wall doing so, which he denied when he spoke with Rockett. She testified this was also a sexually deviant offense. Rockett explained that Poltorak's version starkly contrasted with the records, which is significant when you look at his history and grooming patterns. She discussed the significance of Poltorak going to prison for an offense, being released, then committing the same offense again, which showed his patterns, and "one of the strong risk factors is violation of conditional release. . . if a person is not being deterred by the punishment, then they're considered at a higher risk."

Rockett testified that in diagnosing Poltorak "with unspecified paraphilic disorder likely pedophilia[,]" she used the Diagnostic and Statistical Manual (DSM), which is relied on by psychologists and psychiatrists. Rockett explained pedophilic disorder is an attraction to children which some people act on. Rockett testified that in this case, unspecified paraphilic disorder is a congenital or acquired condition, which can affect a person's emotional or volitional capacity, and Poltorak's sexual offenses are evidence that his emotional or volitional capacity has been affected. Rockett explained that if a person cannot regulate their emotions or tendencies, they have an increased risk of acting out their sexual urges, and the same is true with

volitional capacity and an inability to regulate behavior. She agreed that this chronic condition can go into remission but requires active mitigation to prevent the person from acting on it.

Rockett also diagnosed Poltorak with antisocial personality disorder. She explained that "[a] person with anti[social] personality disorder has a persistent and lifelong disregard for the rights and feelings of others. They tend to act out upon that lack of empathy by doing . . . things to other people to violate . . . their rights. They may engage in antisocial or criminal activity. They may manipulate other people." Rockett explained that to diagnose antisocial personality disorder, there had to be conduct showing problems before the age of fifteen, and she described some of Poltorak's behavioral problems as a child, including alleged sexual improprieties with his adopted sister. During this testimony, the trial court gave the same limiting instruction to the jury when Poltorak objected. As an adult, evidence of his antisocial personality disorder included violating conditional release and problems in prison with anger and becoming emotionally dysregulated. Rockett testified that antisocial personality disorder was a congenital or acquired condition that can affect a person's emotional volitional capacity, which she observed with Poltorak. Rockett testified this would also require active mitigation strategies to overcome acting on those tendencies.

Rockett scored two actuarial instruments, including the PCL-R and Static-99R. Rockett explained how she scored these instruments. She testified that the PCL-R looks at psychopathy traits that research has shown to be associated with an increased risk of violence, and Factor 2 portions of the assessment addressed antisocial history, which "is the best predictor of sexual violence in terms of looking at the psychopathy personality." Rockett testified that Poltorak's PCL-R Factor 2 score was above average compared to other criminals and caused her concern because it showed his inability to control his behavior. Poltorak's overall score on the PCL-R was above-average for psychopathic features and contributed to her opinion that he suffers from a behavioral abnormality.

The Static-99R, which except for the subject's age, looks at risk factors that do not change. Rockett testified that Poltorak's age of fifty-two was factored into his score by reducing it one point to a "2" on the Static-99R. Nevertheless, she did not believe Poltorak's age reduced his risk because he was able-bodied and focused on grooming children. Poltorak's score on the Static-99R suggests he is a low to moderate risk to re-offend, but Rockett considered other factors outside of that instrument. She testified that there was a body of literature "on risk factors" for violent sexual offender risk assessments, but she could not cite any specific literature.

While completion of sex offender treatment can be a protective factor, Rockett did not find it was a protective factor in Poltorak's case, because he "has not internalized any of the stuff that they are taught" and he did not appear to understand why he offended, which was the point of the treatment. She testified Poltorak's problems with other inmates included stalking, trying to groom them by exposing himself, and giving them candy, and his sexual encounters with other male inmates before the current treatment program all showed he had continued problems, and once he was removed from treatment for being verbally and physically aggressive.

Rockett concluded that Poltorak has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. In determining that Poltorak suffers from a behavioral abnormality, Rockett considered that his sexual deviance combined with his antisocial personality traits or psychopathic features elevated his risk.

Poltorak's Testimony

Poltorak testified he went to prison for committing sexual offenses against children, specifically two convictions for indecency with a child by contact. Poltorak testified that Kensie touched his genitals, but he did not touch her. Poltorak testified he gave a statement to police that he asked Kensie to take a dollar out of his pants and she could have it but did not recall telling police it happened three times in one day. He then agreed that his statement showed that is what he said. He then stated

that "it wasn't the reason of intentional touching[,]" instead he "had asked her if she wanted to get a soda out of the vending machine and she grabbed the money – tried to grab the money out of my pocket." Poltorak testified that based on the statement, he agreed that he intentionally put money in his underwear to have Kensie fondle him while getting it, but he did not remember it that way. Instead, Poltorak remembered that she was excited to get something from the vending machine, and "for some reason, she wanted to just reach all of a sudden in my pocket and grab it[,]" and he must have been confused at the police station. Poltorak said he considered Kensie to be his victim but did not know why he committed the offense.

Poltorak testified he pled guilty to indecency with a child by contact against Kensie and was placed on deferred adjudication probation. He also testified about his probation conditions and his awareness that he could be sent to prison for violating them. He planned to control his behavior and follow the rules but did not, and in 1994, his probation was revoked after he was found to have violated two conditions. Poltorak testified he had contact with children several times but denied touching another child, Gina inappropriately. Poltorak testified after his probation was revoked, he was released early on parole and had to follow certain conditions. Poltorak testified that he violated parole by having contact with children multiple times. Poltorak testified his parole was revoked because he had contact with his girlfriend's children.

According to Poltorak, Carrie was his girlfriend's daughter, and after he returned to prison for violating parole, he was charged with a sexual offense against Carrie that occurred while he was out. Poltorak denied that anything sexual happened with Carrie, did not think he did anything wrong, and denied he was sexually attracted to her. He agreed he pled guilty, was convicted of a second-degree felony offense against Carrie, and he was serving a twenty-five-year prison sentence.

When asked if he ever committed sexual offenses against a child, he said that "the one against Kensie . . . [b]ut I don't remember exactly doing that. With [Carrie], no, I did not. With anyone else, no, I did not." Poltorak said he admitted in his prison group he sexually offended against Carrie but denied he did so just to get through the program, rather he said that he "was doing my work and doing what I was told I needed to do." Poltorak explained that he tried to take responsibility for being around children but denied committing the sexual offense.

Poltorak testified he recently completed the sex offender treatment program, and he testified he had problems with other offenders in treatment, including allegations of snitching, name-calling, bullying, sexually inappropriate behavior, and issues with boundaries. He testified he exposed his genitals to his cellmate but said it was unintentional. He admittedly became angry when this incident was raised in sex offender therapy, and he had an outburst where he cursed at the treatment provider. Poltorak testified that he has anger issues and gets frustrated. Poltorak

13

denied that he was sexually attracted to children. He testified he did not receive disciplinaries for sexual misconduct, indecent exposure, or stalking behavior in prison.

Poltorak testified that if released he would stay away from children, not because he is dangerous but because he did not want people to think badly of him. He does not believe he is at risk to re-offend sexually. Poltorak testified that he would not put himself in a position to re-offend, he is ready to be released after twenty-two years, and believes he is rehabilitated.

Other Evidence

Documentary evidence admitted at trial included: Dr. Rockett's curriculum vitae; Texas Department of Criminal Justice (TDCJ) records for his offense against Carrie including the indictment and judgment, among other things; TDCJ records for his offense against Kensie containing the judgment adjudicating guilt and indictment; State's Motion to Adjudicate guilt showing violations including seeking employment which involved children and that he failed to avoid contact with children; and the Static-99R Coding Form showing a score of 2.

Poltorak's Motion for Directed Verdict

Poltorak moved for a directed verdict after the parties rested. He argued that the evidence was legally and factually insufficient. He also asserted that Rockett testified she did not close the "analytical gap" between the offenses. He argued the

only evidence of his sexual deviance was from twenty-two years ago, and the recent example of stalking behavior in prison was unsubstantiated. Finally, he argued Rockett's testimony about paraphilic disorder with likely pedophilia and antisocial personality was conclusory as it related to a behavioral abnormality. The trial court denied the Motion for Directed Verdict.

Charge, Verdict, and Order of Commitment

The charge included the same limiting instruction on hearsay evidence that the trial court used to admonish the jury throughout the testimony. The jury unanimously found beyond a reasonable doubt that Poltorak was a sexually violent predator. The trial court then ordered him to be civilly committed.

ADMISSION OF EVIDENCE AND EXPERT TESTIMONY

In issue one Poltorak contends the trial court erred by allowing testimony about unadjudicated offenses and Poltorak asserts the source of the allegations was unreliable and there was little probative value. He complains Rockett offered confusing testimony on voir dire regarding other allegations of sexual misconduct and some underlying allegations Rockett considered were unsubstantiated. Poltorak contends "[t]hese unsubstantiated prison incidents were the only remotely recent example of misbehavior" presented to the jury.

We review a trial court's evidentiary rulings for an abuse of discretion. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex.

15

2000); *In re Commitment of Tesson*, 413 S.W.3d 514, 519 (Tex. App.—Beaumont 2013, pet. denied) (citations omitted). If a trial court acts without reference to any guiding rules and principles, or if it acts arbitrarily and unreasonably, it is considered an abuse of discretion. *See E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). We will not reverse a jury's verdict unless the trial court's erroneous admission of evidence probably caused the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1); *Tesson*, 413 S.W.3d at 519.

In SVP civil commitment proceedings, experts may disclose details of the underlying facts or data they relied on in arriving at their opinion, including details of adjudicated and unadjudicated sexual assaults. *See* Tex. R. Evid. 703, 705(a); *see also In re Commitment of Valsin*, No. 09-19-00140-CV, 2021 WL 499069, at *9 (Tex. App.—Beaumont Feb. 11, 2021, no pet.) (mem. op.) (citation omitted); *In re Commitment of Stuteville*, 463 S.W.3d 543, 554–56 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). An expert's explanation of the underlying facts and how those facts shaped her evaluation "assists the jury in weighing the expert's opinion that the person has a behavioral abnormality, which is the ultimate issue that the jury must determine." *In re Commitment of Langford*, No. 01-18-01050-CV, 2019 WL 6905022, at *3 (Tex. App.—Houston [1st Dist.] Dec. 19, 2019, no pet.) (citing *Stuteville*, 463 S.W.3d at 555) (other citation omitted).

Texas Rules of Evidence 703 and 705 govern the admission of the expert's opinion and the admission of this type of evidence forming the basis of the opinion. *See generally* Tex. R. Evid. 703, 705. Rule 703 allows for an expert to rely on facts and data they are "made aware of, reviewed or personally observed" in forming their opinion, if other experts in their field reasonably rely on them, those facts and data "need not be admissible for the opinion to be admitted." Tex. R. Evid. 703. Rule 705(a) permits an expert to state an opinion and the reasons for it without first testifying to the underlying facts or data but may have to disclose those on cross-examination. *See* Tex. R. Evid. 705(a). Further, Rule 705(d) provides:

> If the underlying facts or data [that the expert relied on] would otherwise be inadmissible, the proponent of the opinion may not disclose them to the jury if their probative value in helping the jury evaluate the opinion is outweighed by their prejudicial effect. If the court allows the proponent to disclose those facts or data the court must, upon timely request, restrict the evidence to its proper scope and instruct the jury accordingly.

Tex. R. Evid. 705(d). When a trial court provides the jury a limiting instruction, we presume the jury followed it. *See Day*, 342 S.W.3d at 199; *see also In re Commitment of Alvarado*, No. 09-13-00217-CV, 2014 WL 1285136, at *11 (Tex. App.—Beaumont Mar. 27, 2014, pet. denied) (mem. op.).

Rule 403 allows for the exclusion of relevant evidence if its "probative value is substantially outweighed by a danger of . . . unfair prejudice[.]" Tex. R. Evid. 403. "Evidence is unfairly prejudicial when it has an undue tendency to suggest that a

17

decision be made on an improper basis, commonly, but not necessarily, an emotional one." *In re Commitment of Anderson*, 392 S.W.3d 878, 882 (Tex. App.—Beaumont 2013, pet. denied). Under Rule 403, we conduct a balancing test considering whether: "(1) the probative value of the evidence; (2) the potential of the evidence to impress the jury in some irrational way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence." *Langford*, 2019 WL 6905022, at *4 (citations omitted).

Rockett testified she considered the allegations pertaining to Gina, and it contributed to her understanding of his possible grooming behaviors and offense patterns. When asked what kind of problems he had in the sex offender treatment program, Rockett described his issues with other inmates in treatment, including accusations of stalking, grooming behaviors that included suggestive dance where he exposed himself and giving candy to people, and one incident where he had to be removed from treatment for an angry outburst. Regarding the stalking, Rockett agreed Poltorak self-reported the accusation to a chaplain and the other incident was unsubstantiated. Rockett explained that the incident where he exposed himself to other inmates went to Poltorak's sexual deviance and difficulty controlling his urges. This aligned with Rockett's voir dire testimony about these incidents. She also explained during voir dire and trial that experts in her field typically reviewed and

relied on this type of information when conducting behavioral abnormality evaluations.

Poltorak challenged some facts Rockett reviewed and relied on in formulating her opinion. Although Poltorak denied the details of some incidents, he admittedly had problems with other inmates. He also testified that exposing himself to another inmate was unintentional, and he never received a disciplinary in prison for indecent exposure. He also denied touching Gina inappropriately.

The record establishes that Rockett, like other experts in her field, reviewed prison records, as well as other sexual misconduct allegations made against Poltorak in forming her opinion about whether Poltorak had a behavioral abnormality. *See generally* Tex. R. Evid. 705. Poltorak's problems with other inmates in sex offender treatment and the alleged misconduct toward Gina were part of Rockett's review and assessment of whether Poltorak had a behavioral abnormality. Poltorak questioned the truth of those facts during the trial, but the trial court could have reasonably concluded the probative value of the testimony outweighed the risk of unfair prejudice. *See* Tex. R. Evid. 403; *Alvarado*, 2014 WL 1285136, at *11; *Day*, 342 S.W.3d at 199 (holding the trial court acted within its discretion when allowing experts to discuss the details of offenses and other bad acts committed by Day that are contained in the records they reviewed). Finally, the trial court provided a limiting instruction to the jury several times during the testimony as Poltorak

requested and in the court's charge. *See* Tex. R. Evid. 705(d). We presume the jury followed the limiting instruction. *See Alvarado*, 2014 WL 1285136, at \*11; *Day*, 342 S.W.3d at 199. The trial court did not err in admitting this evidence, and considering the evidence and facts, the rulings probably did not cause the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1); *see also Alvarado*, 2014 WL 1285136, at \*11. We overrule issue one.

## LEGAL AND FACTUAL SUFFICIENCY

In issue two, Poltorak contends the evidence is legally insufficient to support the jury's determination that he is a sexually violent predator, and in issue three, he claims the evidence is factually insufficient.

When conducting a legal sufficiency review of a determination that an individual is a sexually violent predator, we use the same legal sufficiency standard applied in criminal cases. *See In re Commitment of Barbee*, 192 S.W.3d 835, 839 (Tex. App.—Beaumont 2006, no pet.) (citing *In re Commitment of Mullens*, 92 S.W.3d 881, 885 (Tex. App.—Beaumont 2002, pet. denied)). Accordingly, we examine all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could find the elements required for civil commitment as a sexually violent predator beyond a reasonable doubt. *See Mullens*, 92 S.W.3d at 885 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It is the jury's responsibility to resolve conflicts in the testimony, weigh the evidence, and

20

draw reasonable inferences from basic facts to ultimate facts. *Id.* at 887 (citations omitted).

When reviewing factual sufficiency, the Texas Supreme Court held in *In re Commitment of Stoddard* that

> [t]he appellate standard governing a factual-sufficiency review of a finding that a person is a sexually violent predator is whether, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of the verdict, along with undisputed facts contrary to the verdict, is so significant that the factfinder could not have found beyond a reasonable doubt that the statutory elements were met.

619 S.W.3d 665, 678 (Tex. 2020); *Valsin*, 2021 WL 499069, at *7–8 (citation omitted).

In a civil commitment proceeding under chapter 841 of the Texas Health and Safety Code, the State must prove a person is a sexually violent predator beyond a reasonable doubt. Tex. Health & Safety Code Ann. § 841.062(a). To be a "sexually violent predator," an individual: (1) must be a repeat sexually violent offender; and (2) suffer from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *Id.* § 841.003(a). "Behavioral abnormality" is defined as "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2). "A condition which affects either emotional capacity or

volitional capacity to the extent a person is predisposed to threaten the health and safety of others with acts of sexual violence is an abnormality which causes serious difficulty in behavior control." *In re Commitment of Almaguer*, 117 S.W.3d 500, 506 (Tex. App.—Beaumont 2003, pet. denied).

Poltorak contends that without Rockett's conclusory and speculative testimony, no rational factfinder could have found the elements required for civil commitment under the SVP statute beyond a reasonable doubt. He places emphasis on the behavioral abnormality element, so that is where we focus our inquiry. *See* Tex. Health & Safety Code Ann. § 841.003(a). Poltorak points to Rockett's failure to cite specific articles in her testimony and asserts that her testimony constituted mere "ipse dixit."

The jury heard Rockett describe the standard methodology for conducting behavioral abnormality and sexual offender risk assessments, which included reviewing records, interviewing the offender, and scoring actuarial instruments. She said she used that methodology in this case. Although Rockett cited no specific studies, she noted authors recognized within the field who studied risk factors and the scoring of actuarial instruments. Rockett described protective factors she used to score the actuarial instruments but explained why she did not view them as protective in this specific case. Rockett testified it was important to look beyond the Static-99R, and historical data provided indicators of patterns, such as grooming. Rockett

22

explained Poltorak's score on the PCL-R showed an above-average risk to re-offend, and the specific portion that measures antisocial personality traits showed an increased risk of re-offending compared to other criminals. She testified that Poltorak's behavior in prison showed continued difficulties with other inmates in treatment and controlling his urges to do things which violated the rights of others.

Rockett diagnosed Poltorak with "unspecified paraphilic disorder likely pedophilia" which she said was an attraction to children and "antisocial personality disorder," described as "a persistent and lifelong disregard for the rights and feelings of others." She explained those conditions required active mitigation strategies. She also testified that his offenses were sexually deviant since they involved prepubescent children.

In contrast, Poltorak testified that he was not at any risk to re-offend based on his sexual history and he denied being sexually attracted to children. He admitted certain details of his offense against Kensie and denied others, yet he testified he viewed her as a victim. Despite his guilty plea, Poltorak denied that he offended against Carrie, but he agreed this offense occurred while he was on parole. He acknowledged continued difficulty controlling his emotions. He also testified he did not believe he needed to avoid children if released because he was a danger, but he stated he might stay away so people would not think badly of him.

As the sole judge of the weight and credibility of the evidence, the jury could reasonably conclude that Poltorak suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *See id.*; *Stoddard*, 619 S.W.3d at 675; *In re Commitment of Lowe*, No. 09–14–00098–CV, 2014 WL 4363624, at *2 (Tex. App.—Beaumont Sept. 4, 2014, no pet.) (mem. op.); *see also Mullens,* 92 S.W.3d at 887. The jury was free to disregard Poltorak's testimony denying the offenses and denying that he was not attracted to children or that he did not pose a risk of reoffending. *See Mullens,* 92 S.W.3d at 887. Viewing the evidence in the light most favorable to the verdict, a rational jury could have found, beyond a reasonable doubt, that Poltorak has a behavioral abnormality, and the evidence is legally sufficient. *See* Tex. Health & Safety Code Ann. §§ 841.002(2), 841.003(a); *see also Stoddard*, 619 S.W.3d at 675; *Mullens*, 92 S.W.3d at 885. We overrule issue two.

The jury heard from the State's expert that Poltorak suffers from a behavioral abnormality and the basis for that opinion. The jury also heard Poltorak testify that he does not pose a risk of reoffending and his denials of certain facts Rockett relied on in forming her opinion. We will not usurp the jury's role to determine the credibility of the witnesses or the weight to be given their testimony. *See Stoddard*, 619 S.W.3d at 668. We presume the jury resolved disputed evidence in favor of the finding and determined the State's expert was credible and gave more weight to that

24

testimony. *See id.* After examining the entire record, we cannot say "the disputed evidence a reasonable factfinder could not have credited in favor of the verdict, along with undisputed facts contrary to the verdict, is so significant that the factfinder could not have found beyond a reasonable doubt that the statutory elements were met." *Id.* at 678. Thus, the evidence was also factually sufficient. We overrule issue three.

## CONCLUSION

Having overruled each of Poltorak's issues, we affirm the trial court's judgment and order of commitment.

AFFIRMED.

---
W. SCOTT GOLEMON
Chief Justice

Submitted on March 28, 2023
Opinion Delivered June 29, 2023

Before Golemon, C.J., Johnson and Wright, JJ.